

**NATHANIEL H. AKERMAN**
**Partner**
**(212) 415-9217**
**FAX (646) 417-7119**
**akerman.nick@dorsey.com**

December 6, 2016

**VIA ECF**

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *U.S. v. Dan Zhong and Landong Wang,* 16-cr-614 (DLI)

Dear Chief Judge Irizarry:

We represent the defendant Dan Zhong and submit this letter in support of Zhong's application to be released on bail pending the resolution of this matter. We respectfully submit that Zhong is not a flight risk, and that the conditions and package set forth below will "reasonably assure" Zhong's appearance at all proceedings, as well as allow Zhong and counsel to prepare adequately for trial. Zhong requests an evidentiary hearing on any contested issues.

As described below, a bail package for Zhong was approved by Magistrate Judge Reyes on November 17, 2016 after a thorough hearing. The same day, Judge Johnson, after a very brief argument, reversed and denied bail. Now that Zhong has been indicted, he presents herein a complete and enhanced bail proposal. Having heard the government's bail-related arguments, advanced both orally and in writing before two judges, Zhong's counsel is able to address facts and law that were not addressed during the initial bail hearings, including by refuting a number of critical representations made by the government.

Ultimately, the government cannot justify its argument that Zhong constitutes a flight risk. Zhong (i) is a legal permanent resident, as is his wife; (ii) has two daughters, both of whom are U.S. citizens; (iii) resides in a house he owns in New Jersey; (iv) has lived legally in the U.S. since 2000; and (v) owns a New York business. Moreover, Zhong has been aware of the government's investigation of him for over a year. During that time, Zhong left the U.S. and traveled to the PRC for a vacation. Despite knowing of the government's investigation and having traveled to a country beyond the government's reach, Zhong returned to his home in the U.S.

Given this context, the government's essential argument, as described more fully below, is that any non-U.S. citizen who has the ability to buy a plane ticket to his home country or seek refuge in his home country's embassy is ineligible for bail. There is no basis in law (be it the Bail Reform Act or otherwise), to say nothing about equity, for such a proposition.





## I. The Charges in the Indictment

On December 2, 2016, an indictment issued, charging Zhong and co-defendant Landong Wang with five counts ("Indictment"). Count One alleges a conspiracy to commit forced labor in violation of 18 U.S.C. § 1594. Count Two contains a substantive forced labor charge in violation of 18 U.S.C. § 1589. Count Three charges concealing passports and immigration documents in connection with forced labor in violation of 18 U.S.C. § 1592. Count Four alleges an alien smuggling conspiracy in violation of 8 U.S.C. § 1324(a)(1), and Count Five alleges a visa fraud conspiracy in violation of 18 U.S.C. § 1546.

The Indictment contains scant factual assertions. However, a complaint against Zhong and Wang that was filed on November 9, 2016 ("Complaint") sets forth additional allegations, which presumably the government will still seek to prove and upon which it will likely rely in opposing the instant application. As set forth more fully in the Complaint, the charges here arise out of alleged activities by Chinese workers who had visas to enter the U.S. pursuant to a treaty between the U.S. and the People's Republic of China ("PRC") "on the Conditions of Construction of Diplomatic and Consular Complexes in the People's Republic of China and the United States of America." *See generally* Ex. F (Complaint); *see also* Indictment, Overt Acts ¶ 6(a).[1] More specifically, the thrust of the allegations is that Zhong and Wang caused Chinese workers who were under supposed bondage contracts to exceed the scope of their visas (which only allowed them to work on PRC facilities), to perform "independent contracting work at non-PRC facilities." Complaint ¶ 5; *see also* Indictment, Overt Acts ¶ 6(a).

By way of background, Zhong is the President and owner of U.S. Rilin Corp. ("U.S. Rilin"), a New York corporation that is in the construction business. China Rilin Construction Group Co. Ltd. ("China Rilin") is a Chinese company owned by relatives of Zhong. Both entities are referenced in the Complaint.

## II. Prior Proceedings

This investigation has been known to Zhong for over a year. Counsel for U.S. Rilin has been, with the assent of Zhong, cooperating with the investigation for all of that time. Obviously, Zhong was at liberty during the time in which he knew of the investigation.

On November 10, 2016, the day before the Veteran's Day holiday weekend, Zhong was arrested on a three-count complaint ("Complaint") after the government declined the request of his personal counsel to have him voluntarily surrender. On November 12, Zhong was arraigned before Magistrate Judge Arlene R. Lindsay who set a bail hearing for November 17. A copy of the transcript of the proceedings before Judge Lindsay is annexed to this letter as Ex. A.

On November 17, the bail hearing was conducted before Magistrate Judge Ramon E. Reyes, Jr. A copy of the transcript of the proceedings before Judge Reyes is annexed to this letter as Ex. B. Judge Reyes granted bail after a hearing that lasted approximately one and half

[1] The Complaint refers to this treaty as "COCA II," a reference adopted herein. *See* Ex. F ¶ 3 n. 2. A copy of COCA II is annexed to this letter as Ex. G





hours with the following conditions: home detention and electronic monitoring of Zhong to be directed by the Court and administered by the security firm Guidepost Solutions to prevent Zhong from leaving his home (other than to travel with Court permission in New York City and New Jersey); $5 million in cash; a $10 million bond secured by Zhong's home in New Jersey and his daughter's home on Long Island; the surrendering of passports by Zhong, his wife and children; pretrial services supervision; and proof that the Zhong would not have access to bank accounts for China Rilin or U.S. Rilin. Ex. B at 32-35.

That same day, the government, appealed Judge Reyes' decision before Judge Sterling Johnson. A copy of the transcript of the proceedings before Judge Johnson is annexed to this letter as Ex. C. The proceedings before Judge Johnson lasted less than 15 minutes. After hearing a brief argument that the defense was not permitted to complete and without making any findings on the record, Judge Johnson simply reversed Judge Reyes' decision and remanded Zhong. *Id.* at 12-13.

## III. Legal Standard

The Court is required to consider the following factors pursuant to the Bail Reform Act, 18 U.S.C. § 3142 (g), "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community":

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The Bail Reform Act contains a presumption of release (18 U.S.C. §3142(c)(1)(B)) overcome only if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the person...." *See* 18 U.S.C. §3142(e). There is no





basis to conclude that Zhong is a flight risk or that conditions of release cannot be imposed that "will reasonably assure the appearance" of Zhong. Moreover, there are no articulable concerns about the safety of "any person or the community." Thus, Zhong is unquestionably bailable.

If the Court is not satisfied that a personal recognizance or unsecured appearance bond will assure Zhong's appearance, the Bail Reform Act requires the Court to look to 18 U.S.C. § 3142(c) and impose the least restrictive condition or combination of conditions necessary to "reasonably assure" the defendant's appearance. 18 U.S.C. §3142(c)(1)(B).

## IV. The Government Overstated the Strength of Its Charges

At the bail hearing before Judge Reyes the government stated that "these are extremely serious charges" for which "[t]he defendant's facing a significant period of incarceration." Ex. B at 18. The government emphasized that "[w]e're talking about forced labor, the use of forced labor to do construction work . . . contracting work competing against U.S. workers in the U.S." *Id.* In that connection, the government had represented in a letter to Magistrate Judge Lindsay that "the forced labor charge [Title 18, USC. § 1594(b)] carries a maximum sentence of 20 years' imprisonment, as well as a Guidelines range of 108 to 135 months' imprisonment." Ex. D at 5. As addressed, these charges relate to Chinese national workers employed by China Rilin to work on properties of the PRC such as embassies, consulates and missions.

### A. Counts One and Two: Forced Labor

Count One and Count Two rest on allegations that the defendants engaged in a forced labor conspiracy and the crime of forced labor. The government's case with respect to these charges is not strong. Indeed, the allegations of forced labor pursuant to a "bondage" contract and substandard living conditions are not credible and ultimately will not be sufficient to prove the critical element of force, threats of force, physical restraint or threats of physical restraint, or the abuse or threatened abuse of law and legal process, as required by 18 U.S.C. § 1589.

First, as to the "bondage" contract, Zhong had no role in the formation of the contracts referenced in the Complaint – and the government does not allege that he did. The contracts were entered into in China between China Rilin and the workers who were to be deployed on PRC government projects in the U.S. Ex. F ¶ 12. Zhong was not a party to, and was not responsible for the terms of, the contracts. And, again, Zhong owns U.S. Rilin, not China Rilin.

Substantively, the Complaint mistranslates actual words in the contracts. A copy of a sample contract in both Mandarin and English is annexed to this letter as Ex. E. Simply by way of example, the government translates the word *tuo-li* (脱离) as "escape." In fact, this word is more appropriately translated as "to depart" or "to withdraw from." (The Chinese media uses the same verb, *tuo-li,* when describing the U.K.'s withdrawal from the European Union). *See* Declaration of Ningjia Han annexed to this letter as Ex. M.






The government also misrepresents the nature of the contracts. These are not bondage contracts. In fact, these contracts were for highly desirable positions that paid three to five times more than what the workers could earn in their home provinces in the PRC doing comparable work. The contracts provide for a base salary, family payments in addition to the salary while the workers were in the U.S., medical benefits and expense money in the U.S.

The contracts did include certain economic (not physical) penalties to discourage workers from defecting to the U.S. or disclosing secrets of the PRC. That the contracts would contain such provisions is hardly surprising, given that the workers performed services inside highly sensitive diplomatic locations. Of course, U.S. law provides criminal penalties for those who wrongfully disclose secrets (*i.e.,* classified information) belonging to the U.S. government. The workers also posted an economic bond, not a debt, and the contract provided for repayment of that bond with interest. That bond would cover costs of transportation and advanced funds as security in the event a worker breached his contract.

Moreover, the government fails to acknowledge the simple fact that the workers were free to do what they wanted after work hours. They explored New York City, and some travelled outside of the City. In one instance, a worker told an FBI agent on this case that he had visited Niagara Falls, walked across many New York City bridges and enjoyed being in New York. While workers generally were in the U.S. for two to four years, they regularly returned home for events such as children's weddings, family illnesses or deaths, and Chinese New Year. Indeed, this job was so desirable that some of the workers signed up for multiple rotations in the U.S.

The Complaint refers to the government's having "uncovered multiple persons who entered the United States as Construction Business A2 or G2 workers and thereafter escaped from Construction Business custody." Ex. F ¶ 10. We are unaware, however, of any individual who left his employment with China Rilin while working in the U.S.[2]

Finally, the contracts in question are Chinese contracts regarding work to be performed on the legal equivalent of Chinese territory in the U.S., *i.e.,* the PRC's diplomatic premises. Also, these contracts were entered into under the auspices of the above-referenced treaty between China and the U.S. for the construction of diplomatic and consular complexes in the PRC and the U.S. For all of these reasons, the contracts are beyond the reach of the U.S. Attorney – and finding otherwise would violate the PRC's sovereign immunity and raise the specter of reciprocal violations.

As to living conditions, the Complaint alleges that in 2011 certain of the workers resided in substandard conditions in a building on Pavonia Avenue in Jersey City that had hazardous "electrical wiring and outlets," and also that the workers were "locked from the outside by

---

[2] The defense is aware of one individual whom the government may label as an "escapee," Sheng Liu. Liu defected to the U.S. in approximately 2003, well beyond the statute of limitations and when the government acknowledges Zhong was covered by diplomatic immunity. Ex. F ¶ 8. Critically, Liu did not "escape" while he was employed by China Rilin. Rather, Liu returned to the PRC after completing his work for China Rilin in the U.S. He thereafter returned to the U.S. under a tourist visa, and then requested political asylum.





double-key cylinder locks." Ex. F ¶¶ 17-21. The Complaint further alleges that workers lived in substandard buildings on Wayne Street (*id.* ¶ 21 n. 4) and on Summit Avenue in Jersey City. *Id.* ¶ 22. The government fails to advise the Court that the doors to the Pavonia building could be unlocked from the inside (there were keys inside the dwelling available to the residents). Thus, the government's position that the workers were "trapped inside" is simply untrue.

In addition, the Complaint scarcely attempts to draw a nexus between these buildings and Zhong. Indeed, the Complaint alleges only that defendant Wang told inspectors at the Pavonia Avenue premises that he had been sent there by Zhong, which hardly suffices to implicate Zhong in connection with the alleged conditions in that building. *See* Ex. F ¶ 19. The Complaint makes no allegation at all connecting Zhong to the Wayne Street or Summit Avenue premises. And, in fact, this housing was not provided by U.S. Rilin. Therefore, Zhong had no control over the housing, consistent with the absence of any allegation that he did.

Moreover, these conditions largely are alleged to have existed over five years ago and therefore are outside the five-year statute of limitations. *See* Ex. F ¶¶ 18, 21 n. 4 (inspections of Pavonia Avenue and Wayne Street premises occurred in February 2011). As such, these allegations are not a valid basis for criminal charges against Zhong or anyone else.[3]

Significantly, these housing inspections also were in direct violation of COCA II. Section 7.1 of COCA II provides that "[t]emporary housing used by the Construction Party for its construction personnel who are mission members has been deemed private residences of the Construction Party diplomatic or consular mission members and shall be inviolable to the extent provided by the VCDR or China-U.S. Consular Treaty respectively." *See* Ex. G at 5. Thus, alleged conditions at these residences cannot form the basis of a criminal charge here.

### B. Counts Three: Concealing Immigration Documents

Count Three alleges that Zhong and Wang violated 18 U.S.C. § 1592(a) by intentionally holding passports or other immigration documents of the workers with intent to commit forced labor. To prove a violation of this statute, the government has to show that the defendant "(1) concealed, removed, confiscated, or possessed the workers' passports, visas, or other immigration documents; (2) did these acts in the course of violating the peonage statute with the intent to violate the statute; and (3) acted knowingly and intentionally." *U.S. v. Farrell*, 563 F.3d 364, 376 (8th Cir. 2009).

The only allegation in the Indictment relating to holding immigration documents is that on a particular day Wang held passports and visas of workers. Indictment ¶ 6(f); *see also* Ex. F. (Complaint) ¶ 30 (same). The Complaint alleges that Wang "seizes" the workers' passports upon their arrival. Ex. F ¶ 11; *see also id.* ¶ 19 (alleging Wang presented workers' passports to housing inspectors). The Complaint further alleges that Wang kept the workers' passports while

[3] The government also omits that the 2011 cited violations in the Pavonia Avenue house were abated. As to the alleged violations in 2013 at the Summit Avenue premises, the government omits that (1) the violations were dismissed, and (2) the supposedly illegal basement referenced in the Complaint was the residence of the landlord, not the workers.






they were in the U.S. *Id.* ¶ 36. Thus, even accepting all of these allegations as true, they point to Wang's involvement in holding immigration documents (although not necessarily his intent in doing so), but do not suggest any meaningful involvement by Zhong, undercutting any argument by the government about the strength of its case as to Count Three as against Zhong.

### C. Count Four: Alien Smuggling Conspiracy

The government cannot prove a case under 8 U.S.C. § 1324(a)(1) for conspiring to transport illegal aliens within the U.S. A critical element of this statute is that the alien was *illegally* in the U.S. *See U.S. v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008). The Complaint, however, acknowledges that the workers were legally "admitted to the United States for the sole purpose of performing construction work at the PRC Mission or other PRC diplomatic facilities pursuant to A2 or G2 visas." Ex. F ¶ 6. There is no question that the Chinese workers were legally in the U.S. pursuant to COCA II. Thus, this is not a case of visa fraud, but at most a case of workers legally being in the U.S. who are alleged to have worked at premises beyond the scope of their visas.

### D. Count Five: Visa Fraud Conspiracy

Similarly, the government cannot prove a visa fraud conspiracy. The visa application process is supervised by the PRC Permanent Mission to the United Nations and the PRC Foreign Ministry. In fact, the visa applications were completed and thereafter confirmed by the PRC Foreign Ministry. Moreover, the government alleges that it was Wang (not Zhong) who "was the point of contact for each application," *i.e.* each application for an allegedly fraudulent visa. Ex. F. ¶ 41.

While we acknowledge that the resolution of the merits of the charges awaits further proceedings, we submit that the substantial hurdles facing the government in this case demonstrate that the case against Zhong is not strong. Further, we submit that there are numerous legal issues facing the prosecution. The workers had diplomatic immunity, yet agents searched their premises and interrogated them in violation of that immunity. Suppression of evidence resulting from those violations would be the appropriate remedy. In addition, as set forth below, because of November 9, 2016 diplomatic notes from the State Department advising the PRC that the workers' status would cease, all the workers – the alleged victims – were compelled to leave the U.S. and are unavailable to provide exculpatory evidence.

## V. Zhong Is Not a Flight Risk

### A. Zhong Has Substantial Professional and Family Ties to the New York Area

Zhong, a 47-year-old male, was born in the PRC, but came to the U.S. in 2000 and has been a legal permanent resident since 2010. He has no prior criminal record and had never been arrested prior to this matter. He has lived in Livingston, New Jersey since August 2008 in a house jointly owned by him and his wife. Zhong's wife has been a legal permanent resident of the U.S. since 2008. Zhong and his wife file federal and state tax returns.






Zhong and his wife have two daughters, both of whom are U.S. citizens. The youngest daughter, who is 8, lives with Zhong and his wife. Zhong's oldest daughter attends the New York University College of Dentistry and lives in an apartment close to the school. Zhong also has a stepson who attends the New Jersey Institute of Technology and lives on campus. The stepson is a legal permanent resident. The relevant passports and identification cards are available to the Court or Pre-Trial Services.

Zhong is the President and owner of U.S. Rilin, incorporated in 2006 in the State of New York. Annexed to this letter as Ex. H is the certificate of incorporation. U.S. Rilin is a New York corporation.

In sum, Zhong has real and substantial ties to the U.S. This is his home and where he works. His children are Americans in every sense. Indeed, one has lived here for her entire life, and the other since she was young.

**B. The Co-Defendant and the Workers Did Not Flee But Left in Response to U.S. State Department Diplomatic Notes**

At the previous bail hearings, the government disingenuously characterized the November 2016 return to the PRC of defendant Wang and certain workers as fleeing the jurisdiction in the face of criminal charges and argued that these facts militated against granting bail to Zhong. As a threshold matter, Zhong's presence in the U.S. is not at all like that of Wang or the workers. As addressed, Zhong is a legal permanent resident as is his wife. His children are U.S. citizens. He owns a home and a business here. There is nothing to suggest that Wang or any of the workers were similarly situated.

And, indeed, Zhong's conduct to date shows his ties to the U.S., rendering any comparisons to Wang or the workers entirely inapposite. Zhong knew about this investigation for more than a year, but never fled to the PRC or otherwise. In fact, during that time and, as the government well knows, Zhong travelled to the PRC for a vacation and thereafter returned to the U.S. Zhong even notified the government of his itinerary through counsel before leaving and the government raised no objection.

In leaving the U.S., Zhong was interviewed by law enforcement at JFK Airport. Zhong asked, through an interpreter, that company counsel be present for his questioning. The government, however, refused to allow company counsel who was with him in the airport to be present for the interview. When company counsel asked to leave the airport with Zhong, rather than have Zhong interviewed outside counsel's presence, Zhong was unceremoniously swept away after being surrounded by more than five federal agents. After questioning and searching Zhong, the government released him and allowed him to travel to the PRC. Despite this experience and knowing that he was under investigation, Zhong returned to the U.S.

Moreover, the government's melodramatic insinuations about others having fled are not factually justifiable. The government made the misleading representation that Wang "was given the opportunity to stay and address the charges or flee to the PRC, he chose to flee." Ex. B at





18. However, Wang was protected by diplomatic immunity and was free to return to the PRC. In fact, Wang was told by the government, which possessed a warrant for his arrest, that he had the right to leave the U.S.[4]

Even more egregiously, while the government cites the alleged fleeing of the workers to argue that Zhong should be remanded, it is the government that, in essence, caused the workers to return to the PRC, thereby potentially denying Zhong the opportunity to have those individuals provide exculpatory testimony, including that they had not been held in bondage. By way of context, these workers, who also were protected by diplomatic immunity, had remained in the U.S. for over a year at the request of the government, even though they had wanted to return to the PRC. However, on November 9, 2016, the State Department sent letters to the PRC informing it that the worker's "status" would "cease" by November 19, 2016. As a result, between November 10 and 18, 2016, the workers returned to the PRC.

The government arrested one worker at JFK airport on a material witness warrant only to release him when he asserted diplomatic immunity at a deposition held on November 17, 2016. The government did not challenge his assertion of immunity and allowed him to return to the PRC. At the deposition, the worker's court-appointed lawyer stated:

> I would note that the limited documentation I have received from the consulate for the People's Republic of China indicates that there had been a Memorandum of Understanding between State Department and the People's Republic of China requesting that the various named, I believe, 57 employees leave the United States within a stated period of time and in compliance with that memorandum and directive, the witness who is presently here was, in fact, leaving the United States as agreed upon in that memorandum when he was taken into custody.

The government prosecutor did not take exception to that statement. A copy of the deposition transcript is annexed to this letter as Ex. J.

Before Judge Reyes, the government also raised the specious argument that "should this defendant step into either the Chinese Mission or the Chinese Consulate, there is nothing

[4] The Complaint alleges that Wang "was an accredited diplomat to the PRC Embassy in Washington, D.C. beginning in April 2001." Ex. F ¶ 9. Although the Complaint alleges that Wang "lost his diplomatic privileges and immunities" when he "relocated to the New York metropolitan area in 2007" (*id.* ¶ 9), the government's actions betray this allegation and confirm that Wang did in fact have diplomatic immunity on November 11, 2016, when the government permitted him to return to the PRC. In fact, it was not until November 9, 2016, that the State Department delivered letters to the PRC stating that "the Department informs the Embassy that it is unable to accept the accreditation of WANG, Landong and any privileges and immunities to which he may have been entitled will cease at noon on November 11, 2016." A copy of the State Department letters are annexed to this letter as Ex. I. On November 10, 2016, the day before he returned to the PRC, Wang met with the government for approximately two hours at his attorney's office in New Jersey. Rather than arrest him, the government asked Wang to remain in the U.S to assist with the investigation. Although armed with an arrest warrant, they did not stop him from boarding a plane to the PRC, acts that were all consistent with Wang's having diplomatic immunity up until the time he left the U.S. At the hearing before Judge Johnson the government acknowledged that it "tried to encourage [Wang] to stay here to fight the charges. He elected to flee." Ex C at 5.





that law enforcement can do about that, because those are inviolate buildings that law enforcement from the United States cannot enter." Ex. B at 10. However, the government has made no showing at all that if Zhong walked into the Chinese Mission or Consulate, the PRC government would allow him to stay there indefinitely.

Moreover, and perhaps more critically, for this purported potential strategy to allow Zhong to avoid the charges in this case, he would have to remain at PRC property in the U.S. for the rest of his life, arguably a worse punishment than what he would ever receive if the government were successful on this prosecution. Furthermore, the government in effect is taking the position, not sanctioned by the Bail Reform Act or any other legal authority, that no foreign national should ever be released on bail because he could enter his national mission and remain there forever. To suggest that this possibility makes foreign nationals non-bailable *a priori* is absurd.

**C. To the Extent There Is Concern that Zhong Is a Flight Risk, Home Detention Enforced by Guidepost Solutions Will Guarantee His Appearance in Court**

Guidepost Solutions, a global security firm based in New York, submits herewith a comprehensive bail security plan to ensure that Zhong does not flee. *See* Ex. L. This security company is led by former federal prosecutors from the Eastern and Southern Districts of New York and has a successful track record since 1991 of providing bail security for defendants in both the New York federal and state courts. In none of their bail security assignments has a defendant ever escaped. Ex. B at 27-30. And, Guidepost Solutions has a track record of providing services in the context of foreign defendants as well. *Id.* at 26-28. Zhong's family in the PRC would bear the cost of this bail security program.

The critical components of what Guidepost Solutions proposes to do at the direction of the Court are as follows:

- Secure Zhong's residence in Livingston, New Jersey, including by installing security technology throughout the interior and exterior of the residence;

- Provide two armed security professionals, who are former or off-duty law enforcement officers, 24 hours per day, seven days per week in two 12-hours shifts each day;

- When Zhong is permitted by Court order to leave his residence for activities such as attorney and medical visits (or for any other purpose), there will be a third security professional who will serve as a driver in a security vehicle;

- If necessary (and there are no facts suggesting it would be), Guidepost Solutions would use reasonable, legal force to prevent Zhong from fleeing; and

- Only the residents of the home and Court-approved visitors would be allowed in the residence.





The government has provided no valid reason why this arrangement would not be sufficient to ensure Zhong's presence in Court.

## VI. Upon Release on Bail, Zhong Will Have No Access to Funds

In the prior bail hearing Judge Reyes raised concerns about Zhong's having access to large sums of cash. While the Guidepost Solutions security package should render this issue moot, Zhong proposed to make this issue indisputably moot through the appointment of a trustee. Specifically, Zhong will agree to a Court order placing an accounting firm, selected by U.S. Rilin company counsel, to become the fiscal agent of the financial affairs of him, his family and U.S. Rilin. The fiscal agent will be a required signatory on all checks or wire authorizations and will send notices to all financial institutions where Zhong or his company has accounts withdrawing any signing authority of Zhong. The agent also will operate the business of U.S. Rilin and pay all bills for U.S. Rilin. While Zhong may be consulted on business decisions, he will have no access to any of the company's funds. Moreover, the Guidepost Solutions proposal expressly provides that "[n]o approved visitor, except for counsel, will be permitted to enter the Residence if he or she is carrying over $200." Ex. L at 2.

## VII. Because of the Unique Circumstances of this Case, Zhong Needs to Be Readily Available to Assist Counsel in the Defense of His Case

A significant factor that should also be considered in determining whether to grant bail is the ability of the defendant to assist counsel in the defense of his case. This factor was emphasized in *U.S. v. Vitta*, 653 F Supp. 320, 337 (E.D.N.Y 1986):

> The quality of the detainee's legal defense is likely to diminish dramatically as long as he or she is incarcerated. The interlude between arraignment and trial is "perhaps the most critical period of the proceedings . . . when consultation, thoroughgoing investigation and preparation . . . [are] vitally important . . ." *Powell* v. Alabama, 287 U.S. 45, 57, 53 S. Ct. 55, 77 L. Ed. 158 (1932). As an esteemed jurist has noted: During this period, defense counsel is retained or assigned, negotiations for dismissal or reduction of charges are carried on, indictments are handed down, motions to sever, to dismiss, to remove, to change venue, and to discover are argued, pleas are settled upon, witnesses are interviewed, evidence is sought, strategy is planned, and presentence reports may be written. A defendant free on bail or on his own recognizance can make good use of this liberty. He is available on a twenty-four hour basis to consult and participate fully with counsel in time-consuming preparations for trial. He alone may be able to locate and persuade defense witnesses to testify. He is often the key source of factual details on which to base pretrial motions and negotiations. He can assist in tracking down evidentiary leads. Authorities recognize that prior detention hobbles adequate preparation for trial. (citations omitted).

This explanation about the importance of bail to a defendant's ability to assist in the preparation of his defense, applies with greater force than usual in this case. The government's





far-ranging allegations concern *inter alia* (i) purported visa fraud in the context of workers hired in China by China Rilin to perform work on PRC government facilities in the U.S., which implicates diplomatic immunity and a great number of factual issues; (ii) impermissible work purportedly performed by these workers at various sites in the U.S.; and (iii) purported forced labor involving these workers based in part on alleged "debt bondage contracts" executed by the workers and China Rilin in China. It will be necessary, of course, for counsel to have extensive discussions with Zhong regarding these and other allegations.

Furthermore, as addressed in the Complaint, the government alleges that there are certain critical documents in Mandarin. *See* Ex. F ¶¶ 12-15. Mandarin is particularly difficult to translate definitively into English. Moreover, Zhong has a complete lack of facility with English and lead counsel has no ability to speak Mandarin.

In this context, forcing counsel to travel to the Metropolitan Detention Center ("MDC"), where Zhong is confined, anytime counsel needs to confer meaningfully with him, including about documents in Mandarin and also about on an ongoing investigation, will by definition place Zhong at a distinct disadvantage in preparing for trial. Indeed, the MDC does not permit lawyers to leave documents with an inmate to review, nor does it allow lawyers to bring in documents on a hard drive or computer unless it gets advance approval for each such visit. All of these logistical obstacles will unquestionably "hobble . . . adequate preparation for trial." *Vitta*, 653 F. Supp. at 337.

Moreover, defense counsel will be required to undertake investigative activities via telephone calls to the PRC and perhaps by traveling there. It will be imperative to have ready access to Zhong in connection with these activities (including by telephone if counsel is in the PRC) in order to confer with him regarding issues to be discussed with witnesses or others who might have access to critical information. Given the procedures at the MDC, language barriers, as well as the 13-hour time difference, such consultation will simply be impossible if Zhong is detained. To be clear, we are not suggesting that Zhong himself would be interviewing witnesses, but rather that counsel must be able to communicate with reasonable ease with Zhong during the course of its investigation.

## VIII. Conclusion

For the reasons stated, the Court should release Zhong under the terms of a bail package similar to that adopted by Judge Reyes:

- home detention and electronic monitoring of Zhong to be directed by the Court and administered by Guidepost Solutions to prevent Zhong from leaving his home (other than to travel with Court permission to New York City and in New Jersey);

- an appropriate cash amount to be determined by the Court;

- a bond in an appropriate amount as determined by the Court and secured by Zhong's home in New Jersey and his daughter's house;





- the surrendering of passports by Zhong, his wife and children;
- pretrial services supervision; and
- proof that Zhong does not have access to founds of China Rilin and U.S. Rilin.

Very truly yours,

Nathaniel H. Akerman
Partner